NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| Elizabeth WILLIAMS, | : | |
| | : | |
| Plaintiff, | : | Civil No. 17-1631 (RBK/AMD) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| Elizabeth CONNOLLY, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendants' Motion to Dismiss (Doc. No. 9), Plaintiff's Opposition (Doc. No. 11), and Defendants' Reply thereto (Doc. No. 17). Plaintiff Elizabeth D. Williams has sued Defendants Elizabeth Connolly, Commissioner of the New Jersey Department of Human Services; Meghan Davey, Director of the New Jersey Division of Medical Assistance and Health Services; and Sara E. Maloney, Deputy Director of the Cape May County Board of Social Services. All have been sued in their official capacities. Plaintiff alleges the State of New Jersey has applied a policy in a state agency's Medicaid hearing that has deprived her of her federal statutory and constitutional rights. Because Plaintiff's claims are barred by the Eleventh Amendment, and because the declaratory relief she also seeks is not tied to any cognizable injunctive or damages claims, Defendants' Motion to Dismiss is **GRANTED**.

1

## I.    FACTS AND BACKGROUND

### A.  Plaintiff's Illness and the Transfer of Her Home.

In 2011, John C. Davis, Sr., started to notice that his elderly mother, the plaintiff in this matter, was not taking care of herself. Plaintiff had been hoarding items in her home, eating unhealthily with a tell-tale preference for sugar, and, most worrisomely, episodically wandering from her home when she should have been sleeping. Recognizing that the streets of Philadelphia were no place for an 87-year-old parent to be at night, Mr. Davis brought his mother to live with him at his home in New Jersey in January 2012. In his sixties, semi-retired and usually working from home, Mr. Davis and his spouse took care of his mom. Plaintiff could not shop, drive, cook, or pay bills. She could not clean herself, or bathe, or change her diapers, or cut or eat her food. Mr. Davis hired female caregivers to bathe and dress his mom on four out of five weekdays, and he and his wife took the other days, including weekends.

Not long after moving in with her son, Plaintiff was diagnosed with Alzheimer's disease. According to her primary care physician, she was "totally dependent" on her son's care. Plaintiff claims Mr. Davis provided near-constant care for her during this time, approximately 133 of the 168 hours of the week, or 79.16% of the week. Presumably, though, Mr. Davis dedicated at least some of his claimed daily five hours of free time to work and sleep.

After nearly three years of living with Mr. Davis and his family, Plaintiff was admitted to the Shore Memorial Hospital, complaining of pain in her neck and hips. She was diagnosed with leg and neck fractures, and was hospitalized for a few days. She then entered a nursing home. She is now wheelchair bound, and Plaintiff has lived in the nursing home since October 31, 2014.

What brings Plaintiff to court today is a Medicaid exemption for a piece of property. On February 13, 2012, Mr. Davis—who has, and had, power of attorney over his mother—sold his

mother his home, the property 3 Gladwyn Drive, Ocean View, New Jersey, for $379,122, a value

based on the tax assessment of $389,700. (Compl. Exs. H, M at 4-5.) To purchase the property,

Plaintiff liquidated several security or investment instruments:

DWS Investment Account ................................................................$123,460.58
Cash...............................................................................................$15,011.99
Federated Investment Account ........................................................$86,141.15
Vanguard IRA ................................................................................$49,918.88
Series EE Savings Bonds ................................................................$93,884.00
Total .............................................................................................$368,416.60

(Compl. Ex. J at 2.) A few years later, on December 19, 2014, Plaintiff, who by all accounts

appears to be severely disabled, deeded the Ocean View home back to her son for $1.00. (Compl.

Ex. I.)

## B. Medicaid

To understand the effects of this transfer, some background information is helpful. The

Medicaid Act is a cooperative federal-state program that is jointly financed with federal and state

funds. *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 501 (1990). Medicaid covers individuals

who are blind, disabled, or 65 or older if they are financially qualified, 42 U.S.C. § 1396a(10), and

qualifying individuals are entitled to funding for long-term care in "nursing facility services." 42

U.S.C. §§ 1396d(a), 1396p(c)(1)(C)(i)(I). For an individual to be eligible for Medicaid benefits, a

person's income and resources must fall below a certain limit, with certain exceptions. *Johnson v.

Guhl*, 91 F. Supp. 2d 754, 760 (D.N.J. 2000). Section 1396p(c)(1)(A) of the federal Medicaid

statute provides that "[i]f an institutionalized individual . . . disposes of assets for less than fair

market value" by a "look-back date," "the individual is ineligible for medical assistance" for a set

of services, including long-term nursing care. As relevant here, the "look-back date" is defined by

the Act as a date that is 60 months before (1) the date an individual became institutionalized and

applied for Medicaid, or (2) the date when a non-institutionalized individual applies for Medicaid or (if later) disposes of assets for less than fair market value. 42 U.S.C. § 1396p(c)(1)(A)-(B).

When an individual seeks benefits for an institutional level of care, transfers of resources are scrutinized. N.J. Admin. Code 10:71-4.10. "If an individual . . . (including any person acting with power of attorney or as a guardian for such individual) has sold, given away, or otherwise transferred any assets," a transfer penalty of ineligibility is assessed. N.J. Admin. Code 10:71-4.10(c). An individual who transfers or disposes of resources for less than fair market value during or after the start of the sixty-month look-back period before the individual becomes institutionalized, or who applies for Medicaid once institutionalized, is penalized for making the transfer. 42 U.S.C. § 1396p(c)(1); N.J. Admin. Code 10:71-4.10(m)(1). The transfer penalty is designed to penalize individuals who use Medicaid benefits when they could use the transferred resources instead. *W.T. v. Div. of Med. Assistance & Health Servs.*, 391 N.J. Super. 25, 37, 916 A.2d 1066, 1074 (App. Div. 2007) ("Transfers of resources within the stated time frame are presumed to be improperly motivated to obtain Medicaid eligibility, a presumption which can be rebutted by proofs 'that the assets were transferred exclusively (that is, solely) for some other purpose' than Medicaid qualifications.") (citing N.J. Admin. Code 10:71–4.10(j)).

There are limited exceptions to the transfer penalty rules, including, as relevant here, the "caregiver" exemption. The federal Medicaid statute, 42 U.S.C. § 1396p(c)(2), provides that an individual may not be subject to the transfer penalty rules when "the assets transferred were a home and title to the home was transferred to . . . a son or daughter" who was residing in that individual's home for a period of at least two years immediately before the date the individual became institutionalized. New Jersey's Medicaid provisions closely track the federal statute, adopting essentially the same exemption:

(d) An individual shall not be ineligible for an institutional level of care because of the transfer of his or her equity interest in a home which serves . . . as the individual's principal place of residence and the title to the home was transferred to . . .

4. A son or daughter . . . who was residing in the individual's home for a period of at least two years immediately before the date the individual becomes an institutionalized individual and who has provided care to such individual which permitted the individual to reside at home rather than in an institution or facility.

i. . . . the care provided by the son or daughter shall have been essential to the health and safety of the individual and shall have consisted of activities such as, but not limited to, supervision of medication, monitoring of nutritional status, and insuring the safety of the individual.

N.J. Admin. Code 10:71-4.10(d).

Importantly, the "care provided by the individual's son or daughter" must exceed "normal personal support activities" like routine transportation or shopping. It must also involve treatment of someone whose physical or mental condition requires "special attention and care." N.J. Admin. Code 10:71-4.10(d)(4). The "receipt of Medicaid benefits is not automatic . . . proof must be forthcoming specifically establishing each requirement of the exception to obtain its application." *M.K. v. Div. of Med. Assistance & Health Servs.*, 2016 WL 2759273, at *7 (N.J. Super. Ct. App. Div. May 13, 2016).

## C. The Hearings

On March 10, 2015, Plaintiff filed for Medicaid assistance, seeking eligibility effective March 1, 2015. On August 24, 2015, the Cape May County Social Services – Medicaid Unit, the county welfare agency ("CWA"), granted this application, granting her Medicaid assistance, to be effective July 2, 2018. Plaintiff was found to meet the Nursing Home Medicaid Guidelines for eligibility. However, a penalty had been applied for 1,219 days at a daily rate of $332.59, "due to a transfer of resources" that the CWA did not elaborate on. This sum totaled $405,318.38. Plaintiff

followed up, and asked what the basis for this penalty was. A caseworker provided this breakdown of the transfer penalty calculation by email:

| | |
|---|---|
| DWS Investment Account | $123,460.58 |
| Granddaughter | $10,000.00 |
| Federated | $86,141.15 |
| Vanguard IRA | $49,918.88 |
| Bonds | $120,578.00 |
| [Certificate of Deposit] | $15,219.77 |
| Total Penalty | $405,318.38 |

(Compl. Ex. J at 3.) This led to a December 24, 2015 hearing on whether this notice was sufficient under *Goldberg v. Kelly*, 397 U.S. 254 (1970), which requires a state to provide timely and adequate notice to Medicaid applicants. Administrative Law Judge W. Todd Miller held that notice about the penalty was insufficient because neither the original CWA notice nor the clarifying email mentioned the transfer of Plaintiff's home to her son. The ALJ ordered the CWA to supply Plaintiff with a revised notice detailing which transactions resulted in the penalty, as well as an explanation for why the caregiver exemptions did not apply.

The CWA sent Plaintiff a new notice of eligibility. The CWA stated, as before, that a penalty was imposed for the transfer of resources. But this time, the CWA explained the caregiver exemption did not apply when the house was transferred back to Plaintiff's son for a dollar, for two reasons:

> The son has not provided full time care that exceeded normal personal support activities to the Applicant which permitted the Applicant to reside at home rather than in an institution or facility, and furthermore, Applicant paid for her own caregiving and
>
> The Applicant has failed to provide adequate documentation as to her physical or mental condition that required special attention and care for the required two (2) year period in producing medical records/ADL clinical verification.

(Compl. Ex. K.)

On March 31, 2016, ALJ Miller held that Plaintiff was eligible for the caregiver exemption. (Compl. Ex. M.) He imposed no penalty for the October 2014 sale of her home to her son, although he did impose a transfer penalty of $26,196.38 of uncompensated value related to other transactions. The ALJ noted that the Supreme Court of New Jersey had held that "property transfer should not be viewed with skepticism and disapproval merely because it may precede Medicaid eligibility," *H.K. v. Dep't of Servs., Div. of Med. Assistance & Health Servs.*, 184 N.J. 367, 379-80 (2004), and that "so long as the law allows competent persons to engage in Medicaid planning, incompetent persons, though their guardians, should have the same right." *In re Keri*, 181 N.J. 50, 69 (2004).

The ALJ held that the purchase price of the Ocean View home was very close to market value. He noted that Plaintiff had lived in the home she purchased from her son for two years and six months, in excess of the two-year requirement imposed by the caregiver exemption. CWA had apparently accused Mr. Davis of fraud and a conflict of interest by selling his house to his demented mother and then buying it back for a dollar. The ALJ thought differently, and held that because Plaintiff's son was lawfully permitted to execute the 2012 and 2014 transactions pursuant to his power of attorney, his actions and motives should not have been impugned. (Compl. Ex. M at 16-17.) Furthermore, the ALJ held that Mr. Davis provided the level of care necessary for the caregiver exemption; he did "not have to be a 24/7 indentured servant to qualify for the caregiver exemption." (*Id.* at 18.) The fact that Mr. Davis sold his own home—which he continued to live in—to his demented mother, who then deeded it back to him before entering publicly-funded nursing care, did not prevent the ALJ from finding it was within the caregiver exception.

This, though, was not the end of the matter. Director of the Division of Medical Assistance and Health Services Meghan Davey reviewed the case and adopted in part and reversed in part

ALJ Miller's March 31, 2016 decision. *See* Final Agency Decision, *E.W. v. Div. of Med. Assistance and Health Servs.*, OAL Dkt. No. HMA 14667-2015. Director Davey, a defendant in this action, upheld ALJ Miller's imposition of the $29,196.38 transfer penalty relating to other transactions. Director Davey disagreed, however, with ALJ Miller's finding that the home transfer fell within the caregiver exemption. She noted that the purpose of the caregiver exemption is to compensate a child who kept her parent out of a nursing facility for at least two years, which she disagreed had happened here. Director Davey noted that Plaintiff had paid for aides and for her granddaughter to tend to her at least 35 hours a week and that her 2012 tax returns had reported having spent $15,800 for caregiving, and $19,058 in 2014 (2013 was unavailable). She found that Plaintiff "cannot be the funding source of the care that kept her from entering a nursing facility during the time that her son is claiming he was the provider of such care." (*See* Compl. Ex. N at 6.)

Director Davey also expressed other doubts that led to her conclusion that the exemption did not apply. Although Mr. Davis claimed to have taken care of his mother 133 of 168 hours a week, Plaintiff had paid for 35 hours of care herself, and there was an open question about how Mr. Davis could provide constant care when he had apparently claimed a Homestead Exemption in his Florida home, a status that would require a homeowner to "in good faith make . . . [the Florida property his or her] permanent home." Fla. Stat. § 196.031. A permanent home in Florida, Director Davey reasoned, implicated less-than-constant care at home in New Jersey. Director Davey also questioned whether Plaintiff actually did receive fair market value for her home. She purchased a home from her son, who had already occupied the abode along with her daughter-in-law and great-grandson. Her son continued to use the home as his business address. He used it rent free. Plaintiff paid off her son's mortgage, paid off the real estate taxes, and permitted the family to remain in the home. (Compl. Ex. N at 7.) For these reasons, on March 31, 2016, Director Davey

held that the penalty for transferring assets would be $405,218.38, affirming the original determination.

Plaintiff has since presented an email she alleges evinces a policy misinterpreting or misapplying the caregiver exemption. (Opp'n Br. Ex. B.) This April 8, 2016 email sets forth what we term the New Policy. Among its pertinent provisions are that an eligibility determining agency would (a) evaluate "proof that an institutional level of care was needed by the Medicaid applicant at least 24 months prior to the date of institutionalization"; (b) evaluate "proof that the care provided by the caregiver child exceeded normal personal support activities and permitted the Medicaid applicant to stay in their home for more than 24 months when they would have otherwise needed long term level of care"; and (c) evaluate "the entire situation as a whole, ensuring that the nursing facility level of care was needed, that the caregiver child was living in the home and that the caregiver child really did provide necessary hands on care that exceeded support activities like shopping, bill paying and regular visiting." (Opp'n Br. Ex. B.)

Unsatisfied with the Final Agency Decision, Plaintiff declined to appeal to the Superior Court of New Jersey and filed this § 1983 action instead. She alleges her rights, as statutorily embodied in 42 U.S.C. §§ 1396a(a)(8), (a)(10), (a)(1)(C)(i)(III), (a)(18) and (c)(2)(A)(iv), have been violated. She alleges that the New Policy, manifest in the email and its purported application in the Final Agency Decision, is invalid under the Supremacy Clause. She also alleges violations of the Due Process and Equal Protection clauses of the Fourteenth Amendment. As remedies, she seeks declaratory relief to the effect that the New Policy violates Plaintiff's rights under the Medicaid Act and the Constitution. She also seeks to enjoin Defendants from "interpreting" State and Federal Medicaid a certain way, and to enjoin Defendants to redetermine Plaintiff's Medicaid application so as to grant an exemption for the home transfer.

Defendants now move for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting a wide range of defenses. They argue the Court must abstain from hearing the action, that Plaintiff has failed to exhaust her state remedies; that Plaintiff is barred by res judicata from the prior agency determinations, or else by issue preclusion; that the Defendants are immune to suit; and that Plaintiff has no private right of action. They also make several arguments disputing the alleged violations of the Fourteenth Amendment.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Defendants have not articulated on what basis this Court should dismiss under Rule 12(b)(1), though we presume they raise the issue in their arguments for abstention. While not strictly a question of subject-matter jurisdiction, such arguments may be raised under Rule 12(b)(1). *See* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed.). That said, a motion to dismiss under Fed. R. Civ. P. 12(b)(1) must be granted if the court lacks subject-matter jurisdiction over a claim. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). On a motion under Rule 12(b)(1), it is the plaintiff who bears the burden of establishing subject-matter jurisdiction. *Gould Elec., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

A district court may treat a party's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) as either a facial or factual challenge to the court's jurisdiction. *Gould Elecs.*, 220 F.3d at 176. "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* (citing *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)). By contrast, "[i]n reviewing a factual attack, the court may consider evidence outside the pleadings." *Id.* (citing

Gotha v. United States, 115 F.3d 176, 178–79 (3d Cir. 1997)); *see United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007). A district court has "substantial authority" to "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

## B. Rule 12(b)(6)

When considering a motion to dismiss a complaint for failure to state a claim, Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the non-moving party. A motion to dismiss may be granted only if the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Although Rule 8 does not require "detailed factual allegations," it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

In reviewing the sufficiency of a complaint, the Court must "tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (alterations in original) (internal citations and quotation marks omitted).

## III.    DISCUSSION

### A.  Younger Abstention and the Exhaustion of Remedies

We begin with the threshold question of whether this Court can hear this case. Defendants have asked this Court to abstain from hearing the case under *Younger v. Harris*, 401 U.S. 37 (1971), pointing to the appeal Plaintiff could have made to the Superior Court of New Jersey with regard to the March 31, 2016 Final Agency Decision. We will not linger long on this question. "Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013). Federal jurisdiction is "virtually unflagging," and abstention is "exceptional." *Id. Younger* abstention is appropriate only where federal litigation could interfere with (1) state criminal prosecutions, (2) civil enforcement actions akin to criminal proceedings, or (3) civil proceedings necessary to enforce certain orders essential to judicial functions, like contempt proceedings. *Id.*; *see Juidice v. Vail*, 430 U.S. 327 (1977).

These exceptions "define *Younger*'s scope," *Jacobs*, 134 S. Ct. at 591, and they do not justify abstention here. Plaintiff alleges violations of federal and constitutional rights by Defendants. But there is no pending criminal proceeding, no pending proceeding akin to a criminal proceeding, and no apparent reason why hearing it would interfere with "essential" judicial functions. *See Dultz v. Velez*, 726 F. Supp. 2d 480, 495 (D.N.J. 2010) ("I conclude, instead, that the administrative proceedings[,] to the extent denied applications can be viewed as proceedings[,] in this case are remedial in nature and, therefore, do not form the predicate for abstention under *Younger*."). Abstention is inappropriate here because another court simply hasn't heard this § 1983 action yet and an appeal to state court was never filed. Even if an appeal had been filed, though, *Jacobs* reversed the Eight Circuit for holding that abstention was proper when there were parallel

proceedings on a set of facts involving significant state interests. We thus find *Younger* is inapplicable, and do not abstain from hearing this case.

We note, furthermore, that Defendants wrongly conflate the analytically distinct doctrines of *Younger* abstention and the exhaustion of administrative remedies. To the extent they argue for the latter, Defendants appear to say Plaintiff cannot bring her 28 U.S.C. § 1983 action in federal court because she has not exhausted her state remedies when she declined to appeal the matter in state court. The Supreme Court settled this question long ago. "[I]t is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Monroe v. Pape*, 365 U.S. 167, 183 (1961). *See also Roach v. Morse*, 440 F.3d 53, 57 (2d Cir. 2006) ("a congressional requirement that states establish administrative review procedures does not imply that § 1983 plaintiffs need exhaust them."). Simply put, there is no exhaustion-of-remedies requirement for the claims Plaintiff brings under § 1983.

### B. Preclusion

Defendants also argue that the March 31, 2016 Final Agency Decision by Director Davey has issue preclusive effect on this case such that *the entire case* cannot be heard in federal court. That's a bold statement, particularly because issue preclusion concerns, as befits the doctrine, *issues*. Defendants point to *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015), a case about the Trademark Trial and Appeal Board's preclusive effects on subsequent federal civil litigation, for the proposition that "when an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *See also* Restatement (Second) of Judgments § 27 (1980). As to state agency

determinations, the Third Circuit has ruled on this as well, noting that "unless a federal statute specifically indicates that state agency decisions should not be considered conclusive . . . factual findings of state agencies should be given the same preclusive effect that they would be accorded in the courts of that state." *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 135 (3d Cir. 1998). Under 28 U.S.C. § 1738, if New Jersey courts would give preclusive effect to this determination, so too must this Court as to the same issue, at least as to questions of fact.

Defendants, though, get ahead of themselves. First, all of the authority Defendants cite speaks to the preclusive effects of state agency findings of fact, not findings of law, and so are not germane to whether a § 1983 cause of action is precluded. But more importantly, Plaintiff does not come to this Court asking for a second application of the law to facts, even if, in substance, she requests that as a remedy. She comes instead to challenge the state policy that she believes led to the Final Agency Decision, alleging violations of various federal and constitutional rights. Under the Restatement (Second) of Judgments § 27 (1982), "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *See also Jewish Home of E. Pennsylvania v. Centers for Medicare & Medicaid Servs.*, 469 F. App'x 99, 104 (3d Cir. 2012) (citing same). Plaintiff's alleged constitutional and federal violations have neither been actually litigated nor determined by a valid and final judgment. Plaintiff's claim is thus not issue precluded, and definitely not res judicata.

### C. Sovereign Immunity

Ordinarily, "states—and, by extension, state agencies and departments and officials when the state is the real party in interest—[are] generally immune from suit by private parties in federal

court" pursuant to the Eleventh Amendment. *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002). *See also Regents of the Univ. of California v. Doe*, 515 U.S. 425, 431 (1997) ("it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance[,] that is relevant."). A driving purpose of Eleventh Amendment immunity is to protect the state treasury from private parties. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."). This immunity, however, is not absolute, and is subject to three exceptions: "(1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law." *Hess*, 297 F.3d at 323 (citation omitted).

The third exception—and the only one that arguably applies here—is the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). As the Third Circuit has explained,

> the theory behind *Young* is that a suit to halt the enforcement of a state law in conflict with the federal constitution is an action against the individual officer charged with that enforcement and ceases to be an action against the state to which sovereign immunity extends; the officer is stripped of his official or representative character and becomes subject to the consequences of his individual conduct.

*Hess*, 297 F.3d at 323 (citing *Ex parte Young*, 209 U.S. at 159–60; *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 103 (1984) (explanatory parenthetical omitted)). Simply put, *Ex parte Young* holds state officials "responsible to the supreme authority of the United States," and will apply if the alleged violation involves the United States Constitution or a federal statute. *Id.* at 323–24 (citing *Balgowan v. New Jersey*, 115 F.3d 214, 218 (3d Cir. 1997) (holding that suit for declaratory relief against state officer under Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, is permissible)); *Pennhurst*, 405 U.S. at 105. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry

into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted).

Injunctive relief against a state must be prospective, not retroactive. Under *Edelman v. Jordan*, 415 U.S. 651, 677 (1974) and its progeny, a federal court may hear suits "against state officials that seek prospective relief to end an ongoing violation of federal law." *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013). "Plaintiffs may not be awarded damages or other forms of retroactive relief." *Id.* Moreover, this "bar on retroactive relief includes forms of equitable relief that are functionally equivalent to damage awards," and "relief that essentially serves to compensate a party injured in the past by the action of a state official, even though styled as something else, is barred by the Eleventh Amendment." *Id.* at 319. How the requested relief is labeled is "of no importance," and a court is to undergo a functional analysis of what is requested. *Id.* (citing *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697-98 (3d Cir. 1996)). In short, when an action "is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officers are nominal defendants." *Edelman*, 415 U.S. at 663 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

Plaintiff has sued three defendants, all in their official capacities, and plainly invokes *Ex parte Young*. Defendants, in turn, invoke sovereign immunity. The complaint alleges the New Policy violates Plaintiff's rights, and seeks declaratory relief that is prospective and therefore not subject to Eleventh Amendment immunity. But Plaintiff also requests two items of relief that are described as injunctive. First, she requests that the Court enjoin Defendants from "interpreting"

the caregiver child statute to require only one caregiver who must be unemployed for two years prior to an applicant's institutionalization. (Compl. at 19.) The first item, concerning prospective cessation of "interpretation," is properly regarded, despite Plaintiff's choice of words, as declaratory—if this Court were to decide on the caregiver exemption, that would be the law, and Defendants would apply it perforce. But the second item is indeed injunctive relief. Plaintiff requests that the Court order Defendants to "re-determine" Plaintiff's Medicaid application in accordance with 42 U.S.C. § 1396p(c)(2)(A)(iv) and grant "the eligibility and exemption of the home transfer from the transfer of asset rules without imposing a transfer penalty." (*Id.*) This requires closer scrutiny under *Edelman*.

*Edelman*'s facts are worth recounting because they involve a state agency determination similar to the one before us here. The plaintiffs had sued Edelman, the Illinois Commissioner of the Department of Public Welfare, for the state's failure to comply with recently-promulgated regulations of the U.S. Department of Health, Education, and Welfare that set the standard for processing welfare applications. *Id.* at 655-56. This failure to apply the HEW regulations had the effect of depriving some applicants of a few months of benefits, and class action litigation soon followed. *Id.* The plaintiffs sought an injunction requiring the state to comply with the HEW regulations, as well as an injunction requiring the state to release and remit back payments that were improperly withheld. *Id.* The district court granted both injunctions, and required the State of Illinois to "release and remit" retroactive benefits. *Id.* at 656.

The Supreme Court held it was improper to order the payment of retroactive benefits. "The funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely the monetary award against the State itself . . . than it does the prospective injunctive relief awarded in *Ex parte Young*." *Id.* at 665. Only

where prospective relief has an "ancillary effect on the state treasury" are such payments allowed. *Id.* at 668. The Court specifically disapproved of payments made "as a form of compensation to those whose applications were processed on a slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard." *Id.* In short, *Edelman* held that a federal court may order future compliance with federal law, even if that imposes serious costs, but may not rectify past failures by compelling a state to "release and remit" withheld benefits.

Plaintiff has attempted to characterize the New Policy as "an ongoing violation of federal law," *Verizon Maryland*, 535 U.S. at 645, for she is still burdened by the June 28, 2016 Final Agency Decision that affirmed a transfer penalty of $405,218.38. We recognize that Plaintiff's eligibility for Medicaid does not begin until July 2, 2018, and that she requests we order her benefits to begin earlier. However, Plaintiff has not challenged her pending receipt of Medicaid benefits, but rather the delay on the receipt of benefits and the transfer penalty. It is true that in a certain sense the withheld benefits in *Edelman* could be characterized as an "ongoing violation of federal law," in that the occurrence of any event, big or small, penalty or not, always echoes on into the future. But that metaphysical difficulty did not stop the Court in *Edelman* from finding that an injunction to remit the withheld welfare benefits was retroactive. What made relief "retroactive" in *Edelman* was that the challenged action was no longer in-progress, not that its consequences continued. Thus, if the remittances in *Edelman* were remedies redressing past actions, and those remedies were subject to the bar on retroactive relief, so too is this previously-imposed penalty. The Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past," *Puerto Rico Aqueduct & Sewer Auth. v.*

*Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993), and so the penalty cannot be challenged in this Court.

Furthermore, an injunction ordering Defendants to "re-determine" the penalty is essentially a judgment that the State of New Jersey assume the costs of the transfer penalty, an act that impacts New Jersey's treasury directly and is thus a form of equitable relief that is "functionally equivalent to damage awards." *Christ the King Manor*, 730 F.3d at 319. This is also barred by the Eleventh Amendment. *See also Gage v. New York State Dep't of Health*, 204 F. Supp. 2d 399, 402 (N.D.N.Y. 2002) (finding challenge to state Medicaid transfer penalty calculations involved retroactive relief and was subject to Eleventh Amendment immunity ); *In re Kish*, 212 B.R. 808, 811 (D.N.J. 1997) (finding sovereign immunity in challenge to penalties imposed by state agency). This, we note, effectively closes off what arguments are available for the few months between now and the beginning of Plaintiff's receipt of Medicaid benefits. This Court cannot require the State of New Jersey to pay benefits it previously determined it would not pay.

Finally, one way of interpreting Plaintiff's request is that this Court order Defendants to reconsider the Final Agency Decision, not vacate the penalty. But this approach does not work either. Were this Court to order Defendants to "think again," Defendants could still reach the same conclusion, making this Court's mandate merely advisory. That is not constitutionally permissible; this Court cannot give relief that is "not of a judicial nature." *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 411 (1792). Federal district courts make judgments, not recommendations, and lack the jurisdiction to act otherwise. Thus the only way to characterize Plaintiff's request to enjoin a "re-determination" is as a request to reverse the penalty itself, which is, as noted, retroactive relief that will directly affect the state treasury. It therefore follows that this Court must dismiss the complaint to the extent it seeks retroactive relief from the transfer penalty.

**D. Justiciability of Declaratory Relief**

There remains the question of whether this Court can entertain an action for declaratory relief when Plaintiff's interest in the litigation is the alleged harm from the Final Agency Decision, a past event for which no retroactive relief can be granted. What remains of Plaintiff's potential remedies is declaratory relief, and "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). *See also Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.").

The Declaratory Judgment Act, 28 U.S.C. § 2201, "does not extend the jurisdiction of the federal courts." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014) (quotations omitted) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). Rather, "federal courts, when determining declaratory judgment jurisdiction, often look to 'the character of the threatened action.'" *Id.* (citing *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952)). Put differently, federal courts evaluating a declaratory judgment action must look at whether there is an underlying "coercive action" that Congress authorized the federal courts to hear. *See Medtronic,* 134 S. Ct. at 848. *See also Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 902 (6th Cir. 2014). If an underlying damages action or injunction is unavailable to a plaintiff, a declaratory judgment action is improper. *Id.* We must therefore determine whether there is a coercive action still available to Plaintiff.

Plaintiff has elected to bring this suit alone, not as part of a class, and how the consequences of this policy allegedly affect other individuals is not relevant to this controversy. *Cf. Sosna v. Iowa*, 419 U.S. 393, 401 (1975) (finding that the resolution of the claims of a class action's named

plaintiff did not render the class's claims non-justiciable). To have a viable claim, Plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). With a finding of sovereign immunity, there is no longer a redressable controversy here if no injunctive relief or damages are available. There is no injury the Court can redress. A declaratory judgment action will not lie without some underlying coercive action available, and none is available here. Plaintiff's other claims are therefore dismissed.

## IV.    CONCLUSION

For the reasons herein, Defendants' motion to dismiss is **GRANTED**. An order follows.


Dated:  _____11/15/2017_____                    s/ Robert B. Kugler_____
                                                    ROBERT B. KUGLER
                                                    United States District Judge